IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN BOOKER, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL NUTTER, et al. | : | NO. 12-00402 |
|     Defendants. | : | |

M E M O R A N D U M

**Stengel, J.**                                                                                         **September 24, 2014**

This § 1983 action against the City of Philadelphia and several Philadelphia police officers stems from an automobile stop of the plaintiff by Philadelphia police. The *pro se* plaintiff alleges that this stop violated his Fourth and Fourteenth Amendment rights. The City has moved for dismissal as a defendant under Rule 12(b)(6). For the reasons stated below, I will deny this motion.

I.  BACKGROUND[1]

On January 29, 2010, at around 12:00 p.m., Plaintiff John Booker was driving eastbound on Venango Street in Philadelphia in a rental car lent to him by his girlfriend Tory Thomas.[2] He stopped at a red light at the intersection of Venango and B Streets. When the light turned green, he turned right onto B Street, heading southbound. A police patrol car driven by Officer Pryor—who is not a party to this suit—made a U-turn,

---

[1] All factual allegations contained in this section are taken from the amended complaint (Doc. No. 14), unless otherwise noted.

[2] See Am. Compl., Doc. No. 14 at Ex. A (Rental Car Agreement).

followed behind the plaintiff and flashed its lights signaling for the plaintiff to pull over.[3] Officer Pryor then announced over the car's loud speaker for the plaintiff to turn off his car, place the car keys on the roof of the car, and to remain inside of the vehicle.

Officer Pryor approached the plaintiff's car and demanded that the plaintiff step out of the vehicle. When the plaintiff asked the officer why he had been stopped, the officer told him that the vehicle he was driving matched the description of a vehicle that had reportedly been involved in a robbery. Officer Pryor then asked the plaintiff if the plaintiff had any weapons on his person and indicated he planned to search the plaintiff's person. When the plaintiff said no, Officer Pryor searched the plaintiff.

After the search, which produced no weapons, the officer told the plaintiff, "Well you'll be held here until the victim is brought to the scene." The plaintiff responded, "I didn't rob anyone, and I don't consent to being illegally detained." The officer detained the plaintiff until the victim arrived at the scene. Two other officers arrived at the scene with the victim in another patrol car. The victim allegedly identified him as the robber.

Four more patrol cars arrived. Officer Alivera, one of the later officers to arrive, stated, "Somebody is trying to frame him." Officer Alivera then proceeded to question the plaintiff without delivering a Miranda warning. The plaintiff answered Officer Alivera's questions, which included inquiries about the plaintiff's intended destination. The plaintiff told Alivera that he was on his way to his then girlfriend's apartment, which was close to that area.

---

[3] As the police officer approached the plaintiff, the plaintiff was able to identify the officer, via his name tag, as "Officer Pryor."

Officer Alivera and his supervisor (John Doe) allegedly began yelling at the plaintiff, "Where's the f***ing gun at?" Officer Alivera then instructed another officer, Officer Luciano, to "pop the hood." The plaintiff told the officers they could not search his rental car without a search warrant. Officer Alivera, who was "vin certified," said he would check to determine if the car was stolen. Upon hearing this, the plaintiff told him, "I showed you the rental car receipt, so there is no need to check under the hood unless you have a warrant."

Officer Luciano popped the hood. Officer Alivera, along with his supervisor, searched under the hood of the car. Officer Alivera located a gun in the car's air vent, held it in the air for display, and then returned it to its initial position in the car's air vent. Another unidentified officer allegedly yelled "there's probably more sh** in the trunk, I'll check it." The trunk was also searched.

During the incident, the plaintiff allegedly was not permitted to obtain his coat in the back seat of the vehicle. The plaintiff repeatedly requested his coat, but the supervisor refused, saying "It's part of the crime scene, put this punk in the patrol car." The plaintiff was then handcuffed, placed in the back of the patrol car, and driven to the 25th District. He was again searched, and then processed, booked, and arraigned.

In two individual interviews conducted by Detective Sean Walsh on January 29, 2010, Officers Alivera and Luciano admittedly recounted the circumstances surrounding their illegal search of the plaintiff's vehicle. Luciano admitted that he had placed the

firearm back in its previous location under the hood of the car.[4] Detective Walsh then used the information from his interviews to obtain a search warrant of the plaintiff's rental vehicle. Sergeant Thomas Walsh approved the complaint prepared by Detective Walsh. On May 19, 2011, Judge Earl W. Trent of the Philadelphia Court of Common Pleas granted an order to suppress the firearm that was discovered by Officers Alivera and Luciano as the result of an illegal search of the plaintiff's vehicle.

The plaintiff filed this action on February 2, 2012. He names as the defendants the City of Philadelphia, Officer Alivera and his supervisor (John Doe), Officer Luciano, Detective Sean Walsh, Sergeant Thomas Walsh, an unnamed police officer (John Doe), and the unnamed public insurance provider for the defendants (John Doe). He later moved to amend his complaint, which I granted on May 8, 2013.[5] As a result of the January 29, 2010 stop, the plaintiff asserts § 1983 claims under the Fourth and Fourteenth Amendments, claiming he suffered mental and emotional distress as a result of these constitutional violations. He also asserts violations of Article I, Sections 3 and 8 of the Pennsylvania Constitution and of the Pennsylvania Political Subdivision Torts Claim Act. He seeks compensatory and punitive damages along with declaratory judgment and injunctive relief. The City of Philadelphia moves to dismiss the claims against it under Rule 12(b)(6).

---

[4] See Am. Compl., Doc. No. 14, Ex. C and E.

[5] The plaintiff was permitted to proceed *in forma pauperis*. See Doc. No. 1 and 2. He requested that he be appointed counsel. See Doc. No. 4. I granted to request to have his complaint made available to the Civil Rights Panel of attorneys. See Doc. No. 5, 8, 13, 16, 17, 18, 19. None had agreed to represent him as of October 28, 2013, and the plaintiff notified the court that he planned to proceed *pro se*. Because the plaintiff is incarcerated, I ordered the U.S. Marshals to serve the defendants. See Doc. No. 20, 23, 25. See also Doc. No. 11.

## II. STANDARD FOR 12(b)(6) MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.[6] Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which she bases her claim. Conley, 355 U.S. at 47. Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. Id. The "complaint must allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564. Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Se. Pa. Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995). The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation

---

[6] In deciding a motion to dismiss, the court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). The court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. Id.

that discovery will reveal evidence of" those elements. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

A court "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Brown v. Card Serv. Ctr., 464 F.3d 450, 456 (3d Cir. 2006)(quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)). In resolving motions pursuant to Rule 12(b)(6), courts must liberally construe *pro se* pleadings. See, e.g., Haines v. Kerner, 404 U.S. 519, 520–521 (1972).

### III. DISCUSSION

A city may be exempt from a suit alleging violations of 42 U.S.C. § 1983 rendered on behalf of city employees, if the suit is brought under the theory of *respondeat superior*. Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 691 (1978). However, if that person can show that the behaviors exhibited by the alleged violators derived either from a city's official policy, custom, or usage or the municipality, then the city can be sued by a claimant. Id. at 690-91.

The plaintiff alleges that the City of Philadelphia had received "numerous meritorious complaints" about the conduct of the defendant officers yet "turned a 'blind eye'" to them, acting with deliberate indifference. He also alleges a failure to train claim and a failure to supervise claim against the City. The City of Philadelphia argues that the

plaintiff failed to state a claim and urges this court to grant the motion to dismiss, based on Twombly's "plausibility standard."[7]

Under § 1983, "[a] municipality may be liable for failing to train its employees if that failure amounts to deliberate indifference" so long as this failure is closely related to the plaintiff's ultimate injuries. A.M. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 582 (3d Cir.2004)(citing City of Canton v. Harris, 489 U.S. 378, 389–90 (1989)).[8] To make out a failure-to-supervise claim, the plaintiff must: "(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure."[9] Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2011)(citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989)).

---

[7] In Twombly, the court established that a complaint could not survive a motion to dismiss if it bore only legal conclusions, without the support of factual allegations that would make the claims plausible. Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). The factual allegations must be sufficient enough to provide a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662 (2009).

[8] "[T]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." City of Canton v. Harris, 489 U.S. 378, 389–90 (1989)(explaining how the failure to train rubric is consistent with § 1983 analysis under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)).

[9] Additionally, "where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." Montgomery, 159 F.3d at 127.

In support of his allegations, the plaintiff attached to his complaint a *Philadelphia Daily News* photo array from April 29, 2011 titled "26 cops who ended up in handcuffs."[10] Officers Alivera and Luciano are shown as two of these officers.[11] The officers pictured were ones who had been arrested within the last two years for crimes related to their positions as officers.[12] According to the plaintiff, some of these individuals were high-ranking officials.[13] The plaintiff also attaches a copy of the investigation report of Luciano conducted by Detective Walsh on January 29, 2010, along with what appears to be an edited duplicate version of this report. The edited version excludes information about the search of the plaintiff's vehicle.[14] In addition, he includes a copy of the Affidavit of probable cause for the search warrant, prepared by Detective

---

[10] See Am. Compl., Doc. No. 14, Ex. I.

[11] The photocopy of the array is very dark and the text underneath the officers' names is unclear. The complaint states, "On October 4, 2010, Defendants Alivera and Luciano were sentenced to serve prison terms for their confessed crimes." The complaint does not explain what these crimes are, however. An article from *The Philadelphia Inquirer* explains that Officers Alivera and Luciano had illegally stopped an undercover officer posing as a drug courier and stole his money and drugs. Joseph A. Slobodzian, Philadelphia Inquirer, "2 officers get 10-15 years for drug theft," Jun. 16, 2011, available at http://articles.philly.com/2011-06-16/news/29665833_1_sean-alivera-christopher-luciano-police-officers.

The plaintiff also attached several news articles to his response to the motion to dismiss. One indicates that other lawsuits regarding this police misconduct have been filed and settled. Another article reports that a grand jury was investigating whether there was a cover-up of the misconduct by high-ranking police officials. A third article dated March 2, 2014 discussed how the Philadelphia Police Department issued a "clarification" to its interview and interrogation policy. See Plaintiff's Response to City's Motion to Dismiss, Doc. No. 24, Ex. A. These articles also support his claim against the City.

Other articles, however, discuss officers in the department who were found to have engaged in abusive tactics while working as officers. Many of those articles discuss officers which were not a part of the photo array that included Alivera and Luciano. See id. The plaintiff does not link these officers to the other defendant officers in this case. These articles would not necessarily support the claim against the City because they talk specifically talk about a few other corrupt officers, who may simply have been "rogue."

[12] See David Gambacorta, Philadelphia Daily News, "A team effort is arresting cop corruption," Apr. 29, 2011 (describing the photo array).

[13] See id. at 5.

[14] See Am. Compl., Doc. No. 14, Ex. C and E, Ex. D.

Walsh, which indicates that "Officer Alivera observed a handgun in the air filter of the engine."[15] The plaintiff provides two other pieces of evidence to support his factual allegations: 1) the summary of the investigation prepared by Detective Walsh and approved by Sergeant Thomas Walsh; and 2) a letter from his criminal attorney stating that the motion to suppress the firearm had been granted.[16]

      These documents offer factual support for the plaintiff's allegation that a pattern of police misconduct related to search and seizures may have existed. It is plausible that this pattern could show a policy, custom, or practice performed by the Philadelphia police officers to which the City was deliberately indifferent. The inclusion of the two versions of the investigative report, prepared by another officer and approved by a supervisor, give rise to the inference that the police misconduct extended beyond the actions of Officers Alivera and Luciano, making it plausible that the City failed to train and/or supervise officers in the police department. Drawing all inferences in the light most favorable to the plaintiff and liberally construing the *pro se* allegations as I am required to do, I find that the plaintiff has provided enough information to withstand a motion to dismiss.[17] The plaintiff is entitled to discovery on whether the City adequately addressed complaints of police misconduct, supervised the officers and supervisors in questions, and/or

---

[15] See id., Ex. F.

[16] See id., Ex. H, J, K.

[17] After discovery, the plaintiff will have to "show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998) (citing Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir.1997)). In other words, the plaintiff will have to establish that the City was aware or should have been aware of the police officers' behavior and did nothing to correct it.

adequately trained the officers to avoid constitutional violations related to searches and seizures.

## IV.  CONCLUSION

For the foregoing reasons, I will deny the City's motion to dismiss. An appropriate Order follows.